IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| COMMODITY FUTURES TRADING COMMISSION,<br><br>           Plaintiff,<br><br>vs.<br><br>TERRY MICHAEL SVEJDA, and CENTURION CAPITAL MANAGEMENT, INC.,<br><br>           Defendants. | 8:21-CV-311<br><br>MEMORANDUM AND ORDER NUNC PRO TUNC |

## I. BACKGROUND

The plaintiff, Commodity Futures Trading Commission, is a federal agency tasked with enforcing the Commodity Exchange Act, 7 U.S.C. §§ 1 et seq. Filing 121 at 1. Defendant, Terry Svejda, was previously registered with the Commission as a commodity trading advisor ("CTA"), and has been actively registered as a commodity pool operator ("CPO") since 2018. Filing 121 at 2. According to Mr. Svejda, he "has worked in the commodities field for over 40 years . . . provid[ing] general commodities advice and guidance to individuals." Filing 140 at 1.

In 2010, Mr. Svejda began Ag Masters Marketing Group, LLC, a subscription service that distributed newsletters and other advisory information related to commodities trading. Filing 121 at 2. Years later, Mr. Svejda started two new businesses related to his experience with commodity futures trading. The first, defendant Centurion Capital Management, Inc., is a Nebraska corporation established by Mr. Svejda (who also served as the

company's officer and director) for the "sole purpose" of acting as the manager of Decadian, LLC. Filing 121 at 3. Decadian is an Arizona limited liability company formed by Mr. Svejda in 2012 with the assistance of his brother and attorney, Mark Svejda. Filing 121 at 2. The development and operation of Decadian are at the heart of this case.

The Commission asserts that Mr. Svejda solicited individuals to invest in Decadian by representing that their funds would be pooled to trade commodity futures contracts—*i.e.*, Decadian was presented as an opportunity to invest in a commodity pool. Filing 120 at 4-5. However, according to the Commission, these were fraudulent representations, as Mr. Svejda never attempted to trade the approximately $790,000 he raised for the benefit of Decadian investors. Instead, the Commission says, he misappropriated the funds for his own personal benefit. *See* filing 120 at 12-17. Based on this conduct, the Commission filed a complaint alleging the defendants violated numerous sections of the Commodity Exchange Act. Filing 1. This matter is now in front of the Court on the Commission's partial motion for summary judgment. Filing 119.

## II. STANDARD OF REVIEW

Summary judgment is proper if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). The movant bears the initial responsibility of informing the Court of the basis for the motion, and must identify those portions of the record which the movant believes demonstrate the absence of a genuine issue of material fact. *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc). If the movant does so, the nonmovant must respond by submitting evidentiary materials that set out specific facts showing that there is a genuine issue for trial. *Id*.

2

On a motion for summary judgment, facts must be viewed in the light most favorable to the nonmoving party only if there is a genuine dispute as to those facts. *Id.* Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the evidence are jury functions, not those of a judge. *Id.* But the nonmovant must do more than simply show that there is some metaphysical doubt as to the material facts. *Id.* In order to show that disputed facts are material, the party opposing summary judgment must cite to the relevant substantive law in identifying facts that might affect the outcome of the suit. *Quinn v. St. Louis Cty.*, 653 F.3d 745, 751 (8th Cir. 2011). The mere existence of a scintilla of evidence in support of the nonmovant's position will be insufficient; there must be evidence on which the jury could conceivably find for the nonmovant. *Barber v. C1 Truck Driver Training, LLC*, 656 F.3d 782, 791-92 (8th Cir. 2011). Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial. *Torgerson*, 643 F.3d at 1042.

## III. DISCUSSION

### 1. CLAIM I: FRAUD IN CONNECTION WITH COMMODITY FUTURES CONTRACTS UNDER 7 U.S.C. §§ 6b(a)(1)(A) and (C)

The Commission first claims that Mr. Svejda's conduct violated 7 U.S.C. §§ 6b(a)(1)(A) and (C). These particular sections of the Act make it unlawful:

> for any person, in or in connection with any order to make, or the making of, any contract of sale of any commodity in interstate commerce or for future delivery that is made, or to be made, on or subject to the rules of a designated contract market, for or on

3

> behalf of any other person, . . . (A) to cheat or defraud or attempt to cheat or defraud the other person; . . . [or] (C) willfully deceive or attempt to deceive the other person by any means whatsoever.

Specifically, the Commission's complaint alleges that the defendants' conduct violated the Act in two ways:

> a. misappropriating pool participant funds to trade futures in Svejda's personal trading account, and to pay personal expenses of Svejda and corporate expenses of Centurion; and
> b. misrepresenting to pool participants and prospective pool participants that Defendants would invest pool participant funds in exchange-traded futures contracts, and instead using pool participant funds to pay personal expenses of Svejda and corporate expenses of Centurion.

Filing 1 at 10.

However, Mr. Svejda argues there is a genuine issue of material fact as to whether the Act even applies in these particular circumstances. Filing 137 at 6. Specifically, Mr. Svejda asserts that, since it was never represented to investors that their Decadian investment funds would be used for trading commodity futures, the Commission failed to establish that any of his alleged misconduct occurred "in connection with . . . any contract of sale of any commodity . . . for or on behalf of any person." Filing 137 at 6. Additionally, Mr. Svejda claims that, even if the Act applies, there are genuine issues of material fact as to his liability. The Court agrees.

4

(a) Issues of Fact Involving the "In Connection With" Requirement

In some circumstances, if aggrieved parties "were never parties to an order for the sale of a commodity," the "in connection with" requirement of the Act may not be satisfied. *Tatum v. Legg Mason Wood Walker, Inc.*, 83 F.3d 121, 122-23 (5th Cir. 1996). Still, fraudulent conduct may be considered "in connection with a commodities future contract" if it misrepresents the fundamental risk associated with such investments and has "some connection with the trading of commodity futures contracts." *R & W Tech. Servs., Ltd. v. CFTC*, 205 F.3d 165, 172 (8th Cir. 2000). Accordingly, "fraud in the sale of investment advice will be 'in connection with' the sale of a commodities future contract if the fraud relates to the risk of the trading and the primary purpose of purchasing the advice is to execute trades." *Id.* at 173. Thus, it is possible for the Act to apply even if the defendant "executed no trades for customers," but it will not apply if the connection to commodity trading is too tenuous. *Id.*

For example, the Eighth Circuit held that the Act applied to a company that "sold computer software to individuals interested in trading commodity futures contracts." *Id.* at 168. Even though the company never made trades on behalf of its customers, the primary reason individuals purchased the software was to execute trades. *Id.* In fact, the business model relied on customers using the software to trade commodities. As a result, any misrepresentation about the software's efficacy that misled potential customers about "trading profits and trading risks" was neither "incidental nor secondary to futures trading, but . . . directly related to . . . trading." *Id.* at 173 (citations omitted).

Conversely, companies that use other methods for dispensing investment advice—such as magazines and newspapers—may not be as directly connected with commodity trading contracts. *Id.* Individuals may consume such products for leisure, research, or educational purposes, with no

5

intent of acting on the trading advice. *Id*. And when individuals are aware their investment does "not involve a futures contract or a futures account," but instead, that they are investing in a partnership in an advisory firm, claims of fraudulent conduct likely fall outside the purview of the Act. *See Rizza v. Durkin*, CFTC No. 86-R85, Comm. Fut. L. Rep. P. 23788, 1987 WL 10352 (Aug. 11, 1987).

According to Mr. Svejda, Decadian was not a commodity pool, but instead, a commodity trading advisory service. Filing 137 at 18. This characterization is supported by the company's "Operating Agreement," which describes that the "purposes of the Company are to engage in the development and operation of a company that will operate a commodity advisory service." Filing 124-1 at 63. As such, Mr. Svejda argues that—as outlined in Decadian materials—investors were never promised that their funds would be used to trade commodities, and any alleged misrepresentations that occurred during these transactions were, at best, incidentally related to futures trading. *See* filing 137 at 7.

This case raises unique issues related to the "in connection with" requirement. If Mr. Svejda fraudulently induced individuals to invest money in a "sham" commodity trading pool and/or made material misrepresentations about the risks associated with such an investment, the Act would surely apply. If, however, individuals were defrauded by Mr. Svejda during the course of purchasing equity in a commodity advisory business, the Act may not apply because Mr. Svejda's allegedly fraudulent conduct may have been only secondarily related to trading contracts. In other words, whether the allegedly fraudulent representations and misappropriations made by Mr. Svejda were done "in connection with" a commodity futures contract depends on the type of investment opportunity that Mr. Svejda represented and the specific claims he

6

made about how the company would operate. For the reasons outlined below, this determination is not appropriate on summary judgment.

Again, according to Mr. Svejda, he offered investors an opportunity to buy ownership in Decadian, a commodity trading advisory service. Filing 140 at 4. In support of this argument, he points to multiple versions of Decadian's "Executive Summary," which was distributed to interested investors. Filing 121 at 8; filing 139 at 7. Portions of the documents appear to describe what would be Decadian's two primary income streams. Filing 124-3 at 34-35. "Option 1" was a subscription service where customers would pay $4,950/year to receive commodity trading advice and recommendations from Decadian. Filing 123-3 at 77; filing 124-3 at 35. This would account for 70 percent of the company's anticipated revenue. Filing 124-3 at 35.

"Option 2" involved the creation of independent LLCs in multiple states. Filing 124-3 at 35. These LLCs[1] would be commodity pools operated by Mark Svejda once he received his CTA and CPO licenses. Filing 124-3 at 35. When individuals purchased stock in an LLC, their funds would be pooled with those of other investors to trade commodities according to Decadian recommendations based on the "Decadian Methodology." Filing 123-3 at 77; filing 124-1 at 37. In return, Decadian would charge a fee. Filing 124-3 at 35. In the executive summaries, both of these options were described under headings such as "The Business of Decadian" and "Decadian Income Streams." Filing 124-3 at 34.

But according to Mr. Svejda, these "options" were not the investment opportunities presented to Decadian's initial investors. Instead, Mr. Svejda

---

[1] These LLCs are referred to, both throughout the evidence and by the parties, by various terms such as Opportunity Funds, Incubator Funds, and wealth funds. The Court will refer to them as "Opportunity Funds" throughout this Order.

claims that he offered investors an opportunity to purchase up to 20 percent ownership in the company to share in the profits generated from these two options. Filing 124-3 at 36. Mr. Svejda claims that this distinction is clearly noted in the executive summaries, with the equity opportunity described under the "What is offered and What is requested" heading. Filing 124-3 at 36. And under the sub-heading "Use of Funds," the document appears to explain that initial investor funds would be used for "Building Membership base via Multiple Marketing and Advertising Venues" and "Staffing and Legal Expenditures"—*i.e.*, operating expenses. Filing 124-3 at 36. As a fringe benefit, individuals who purchased a certain number of Decadian shares would get the perks of being a subscriber without paying the annual subscription fee. Filing 124-3 at 36.

In other words, Mr. Svejda argues that initial investors in Decadian knew their funds would be used exclusively to cover the operating and marketing expenses necessary to build a client base for a trading advisory service. Accordingly, his "failure" to use Decadian shareholder funds to trade commodity futures was in no way fraudulent, as he never promised (nor intended) to use them for such purposes. Filing 140 at 5. And the Commission's evidence only further demonstrates that genuine issues of material fact exist as to the nature of Mr. Svejda's representations about Decadian.

In support of its argument that Decadian investors believed they were investing in a commodity pool, the Commission provides deposition excerpts from numerous investors. Filing 123-4 at 5-11. In its review of the record, however, the Court found that while some of these excerpts may support this conclusion, much of the deposition testimony—when viewed in its entirety—is laden with matters impacting credibility, including inconsistent statements and recollection issues. The chart below highlights some additional testimony

8

from witnesses listed by the Commission as having this "belief," and testimony from others that it did not cite:

| Witness | Statement(s) |
| --- | --- |
| Steven Paschold | "It was more Mr. Svejda saying what we're going to be doing here at Decadian is using money that's been invested to try to reach these people who are going to be for this subscription service." Filing 141-1 at 9-10. |
| Michael Thys | Q: And you knew you were an early investor in this, right?<br>A: Yes.<br>Q: You knew your funds were going to go towards those operating expenses?<br>A: Yes. It's right there. [Referring to Executive Summary]. I didn't remember seeing that. But, yeah I remember it now. Filing 141-1 at 72. |
| Shane Beckman | Q: But you agree that it was never told that the money would be pooled, correct?<br>A: I don't' remember being told that, no.<br>Q: I believe that's what your testimony was this morning. That you stated that there was no pooling of your money with—<br>A: Right.<br>Q: Is that fair?<br>A: Yes. Filing 141-1 at 81. |

9

| | |
|---|---|
| Rodney Cappel | "I don't think I ever thought that the money I invested would go directly into futures contracts." Filing 141-1 at 14. |

This is just some of the testimony that may lend support to Mr. Svejda's argument that he never represented the investors' funds would be pooled to trade commodities. *See also* filing 124-1 at 16; filing 124-2 at 2. And additional testimony from numerous investors—including those relied on by the Commission—indicates that many of these investors frankly could not recall (or never really understood) for what purpose their investment money was going to be used. And while the Court acknowledges that, at one point, Mr. Svejda sent emails alluding that the individual LLCs, or Opportunity Funds, would be funded "from selling stock in Decadian," other documents—when all inferences are drawn in his favor—support his claims that this language was not representative of the Decadian model that was pitched to investors. Whether that is true is for a jury to decide after weighing the entirety of the evidence and assessing witness credibility.

Therefore, while the Court must ultimately determine, as a matter of law, if these transactions have sufficient connection with the trading of commodity futures to make the Commodity Exchange Act applicable, *see R & W Tech. Servs., Ltd.*, 205 F.3d at 171, this conclusion likely turns on controverted facts that are most appropriately resolved by a jury. Additionally, as outlined below, even if the Court were to determine, as a matter of law, that Decadian's business model as described by Mr. Svejda—that shareholders expected part of their profit shares would be derived from the successful trading of independent commodity pools—is itself sufficient to satisfy the "in connection with" requirement, genuine issues of material fact still exist as to

10

the defendants' liability under the Commodity Exchange Act, necessitating trial.

(b) Fraudulent Misrepresentations

First, genuine issues of material fact exist as to the Commission's claim that the defendants made fraudulent misrepresentations to Decadian investors. In order to establish liability for fraud, the Commission has the burden of proving three elements: (1) the making of a misrepresentation, misleading statement, or a deceptive omission; (2) scienter; and (3) materiality. *U.S. Commodity Futures Trading Comm'n v. Kratville,* 796 F.3d 873, 891 (8th Cir. 2015). Whether a misrepresentation has been made depends on the overall message and the common understanding of the information conveyed. *Id.* Thus, when determining if a misrepresentation has been made, it is critical to consider how the overall message "would be interpreted by an objectively reasonable receiver of that information." *Id.*

Scienter, on the other hand, "is established if the Defendant intended to defraud, manipulate or deceive, or if the Defendant's conduct represents an extreme departure from the standards of ordinary care." *Id.* at 893. In other words, the Commission must prove that Mr. Svejda's conduct involved "highly unreasonable omissions or misrepresentations" that presented a danger of misleading investors that was "known to Mr. Svejda or so obvious that [he] must have been aware of it." *Id.* (citations omitted). Finally, representations or omissions are material "if a reasonable investor would consider it important in deciding whether to make an investment." *Id.* at 895. When the language of a solicitation obscures the important distinction between the possibility of substantial profit and the probability that it will be earned, it is likely to be materially misleading to customers. *Id.*

Again, the Commission's primary claim of fraudulent misrepresentation is that, in soliciting investors, Mr. Svejda "misrepresented to actual and potential Decadian customers that their funds would be used for trading commodity futures in a commodity pool." Filing 120 at 12. As extensively outlined above, there are issues of material fact as to whether Mr. Svejda made such representations. Only after hearing the testimony, weighing credibility, and considering the entirety of what Mr. Svejda conveyed to potential investors can a jury determine if objectively reasonable receivers of that information would have interpreted Mr. Svejda's overall message as an offer to invest in a commodity pool. And only then could his failure to use the funds accordingly be the basis of a fraudulent misrepresentation claim.

The Commission also argues that Mr. Svejda's representations about the Opportunity Funds—that they would be established and act as a profit source for Decadian in accordance with certain projections—establish liability as a matter of law because Mr. Svejda admitted these funds were never finalized and funded. Filing 120 at 14-16. But there are factual issues concerning both what Mr. Svejda represented about the Opportunity Funds, and whether the necessary scienter and materiality are established.

First, the Commission emphasizes that Mr. Svejda sent potential investors copies of profit projections in conjunction with documents that insinuated the Opportunity Funds were already established. Filing 120 at 15. However, some investors testified that they read the documents and would not have invested if they were inconsistent with what Mr. Svejda was verbally communicating about the company's general plan and trajectory. *See, e.g.*, filing 141-1 at 118, 126. And it appears that other investors derived their understanding of Decadian's development and progress from independent conversations with Mr. Svejda. *See, e.g., filing 141-1 at 36, 79, 93, 134.*

12

Accordingly, at this stage, the evidence does not clearly establish what a reasonable investor—considering all of the circumstances and Mr. Svejda's overall message—would have believed about the status of the Opportunity Funds at the time of these investments.

And while there is no doubt that these funds were never established and the projected profits never occurred, a jury must decide issues of fact to determine if Mr. Svejda deliberately or unreasonably made misrepresentations about the future existence and potential profits of the Opportunity Funds to induce investments, or whether this is a case of misunderstandings and unfulfilled promises that lack the necessary scienter. For example, there is evidence that before his stroke in 2017 Mr. Svejda—along with his brother Mark—took steps to form Opportunity Funds, including an Iowa Opportunity Fund. *See* filing 124-1 at 5; filing 124-2 at 21-22, 30. Additionally, Decadian was collecting on its other revenue stream—it is undisputed there were individuals subscribing to the Decadian subscription service during the relevant period. *See* filing 145 at 9.

Further, in 2018, Mr. Svejda also created the Decadian Wealth Fund, an independent commodity trading pool. Though the establishing documents do not directly mention Decadian, it is clear that Mr. Svejda was intended to be the company's sole manager, and in this role, he had the power to enter contracts related to the company's business. Filing 141-2 at 38-39. Drawing all inferences in his favor and deferring from credibility judgments, the Court cannot rule out his claim that the fund "would have traded investor funds as a commodity pool using recommendations from Decadian," and thus generated profit for Decadian. Filing 140 at 17. Nor can it rule out his claim that the Commission's investigation of Decadian halted his efforts to continue this venture.

13

As for Mr. Svejda's projections related to the Opportunity Funds, there is evidence Mr. Svejda hired a third party to put together projections based on his business model. Filing 123-6 at 99. And while developing his projection documents, Mr. Svejda appeared to ask others to "tear it apart" and to "make [him] justify the numbers." Filing 124-1 at 19. As for the potential of a $100 million investment in a fund advised by Decadian, Mr. Svejda appeared to inform investors that this was contingent on the company demonstrating a "track record" of investment using the "Decadian Methodology." Filing 124-3 at 22. Additionally, there are examples of Mr. Svejda explaining to investors that the figures were "assuming" the Opportunity Funds reached a certain amount of available funds and alluding to what profits would look like even if the projections were only "half right." *See, e.g.*, Filing 124-2 at 6. Finally, also relevant to what a reasonable investor would believe about these projections are statements from multiple investors that they knew the investment was risky and payouts were not guaranteed. *See, e.g.*, Filing 141-1 at 108, 120.

In sum, questions of fact exist as to whether Mr. Svejda's projections deliberately or unreasonably "obscure[d] the important distinction between the possibility of substantial profit and the probability that it will be earned." *Kratville*, 796 F.3d at 895. And overall, considering the evidence, whether Mr. Svejda's representations concerning the Opportunity Funds were reasonable at the time they were made—or whether he intended to carry out this portion of the business model at all—are factual issues for a jury.

Lastly, materiality and scienter issues also exist surrounding the Commission's claims that Decadian's website fraudulently represented certain documents as evidence of its potential earnings. Filing 120 at 15. According to Mr. Svejda, though the documents reflected profits he made when trading in a third-party account, they were only posted to demonstrate an example of

14

potential trading success when using the "Decadian Methodology." Filing 137 at 24. And the name of the account owner was redacted not to pass the trading off as profits earned by Decadian, but to protect the account owner's privacy. Filing 137 at 24. The Commission's opinion about the "impressions" these documents created is not sufficient evidence to warrant summary judgment. How, or whether, this information had any impact on investor decisions is not clear at this stage. Therefore, given the various credibility and factual issues surrounding the Commission's claims of fraudulent misrepresentation, the Court will deny summary judgment on this issue.

(c) Fraudulent Misappropriations

In addition to determining what representations Mr. Svejda made to investors, there are also genuine issues of material fact concerning the Commission's alleged misappropriation claims. The Eighth Circuit has held that misappropriation of customer funds invested in connection with contracts for the sale of commodities occurs under 7 U.S.C. § 6b(a)(1) if the defendant "deliberately acted contrary to his representations," making his actions "unauthorized and contrary to the instructions of his customers." *U.S. Commodity Futures Trading Comm'n v. Morse*, 762 F.2d 60, 62 (8th Cir. 1985). In other words, any funds that *are determined to have been given in connection with commodity contacts* were misappropriated if Mr. Svejda deliberately used them in an unauthorized manner.

The Decadian Operating Agreement may provide some evidence of the investors' understanding of how Mr. Svejda—acting on behalf of Centurion as Decadian's manager—could spend funds. But as Mr. Svejda has repeatedly argued, Decadian's executive summary appeared to tell investors that their funds would be used for marketing and advertising to build a membership

15

base, along with staffing and legal expenditures. Filing 137 at 33. Given these representations, the Court agrees that the Commission's evidence that Mr. Svejda used such funds in his personal trading accounts and to pay his personal debts is unlikely to be discredited by the jury based solely on Mr. Svejda's later claims that the money was actually transferred to him as an authorized "shareholder receivable." Filing 143 at 5-6.

Still, whether other funds were intentionally used in an unauthorized manner raises stickier questions of fact for the jury. For example, according to Mr. Svejda, he hired individuals who worked for both Decadian and Ag Masters. Filing 140 at 19. In this way, he asserts that Ag Masters provided research, website development, and other work product for Decadian. Filing 123-3 at 87. And transfers from Decadian to the Ag Master's bank account (and vice versa) reflected loans to pay for the authorized operating and development expenses of the company. Additionally, there are factual disputes regarding the investments of five individuals who originally invested in Ag Masters or other opportunities and had their investments either "credited" with Decadian shares or "transferred to" Decadian. *See* filing 123-5 at 20-21; filing 141-1 at 70-73. A jury must determine—based largely on witness testimony—what Mr. Svejda represented to those individuals about their investments, and whether they authorized his actions.

For these reasons and those set forth above, the Court will also deny the Commission's motion for summary judgment on its misappropriation claims.

## 2. CLAIMS II, III, IV, AND V – FRAUD UNDER 7 U.S.C. § 6*o*(1) AND OTHER VIOLATIONS OF THE ACT

The Commission's remaining claims rely on the conclusion that "Mr. Svejda solicited, accepted, and/or received funds for the stated purpose of trading commodity futures in one of more commodity pools." *See* filing 120 at

16

21-21. Specifically, the Commission's second claim alleges that all of the above conduct also violated 7 U.S.C. § 6*o*(1), which states:

> (1) It shall be unlawful for a commodity trading advisor, associated person of a commodity trading advisor, commodity pool operator, or associated person of a commodity pool operator, by use of the mail or any means or instrumentality of interstate commerce, directly or indirectly—
> 
> (A) to employ any device, scheme, or artifice to defraud any client or participant or prospective client or participant; or
> 
> (B) to engage in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or participant or prospective client or participant.

Additionally, Counts III, IV, and V respectively allege that Centurion failed to register as a Commodity Pool Operator ("CPO"), that Mr. Svejda failed to register as an Associated Person ("AP") of Centurion, and that as CPO, Centurion commingled the property of the commodity pool with the property of another person. *See* filing 1. In other words, all of these claims rely on the conclusion that Decadian was acting as a commodity pool.

Under the Act, a "commodity pool" is defined as "any investment trust, syndicate, or similar form of enterprise operated for the purpose of trading in commodity interests." 7 U.S.C. § 1a(10)(A). As outlined above, general issues of material fact exist regarding whether the "purpose" of Decadian—as related to the investments in question—was to operate a commodity pool and trade in commodity interests, rather than act solely as an advisory entity. For those

reasons, the Court must deny the Commission's motion for summary judgment as to these claims. Accordingly,

> IT IS ORDERED that the plaintiff's motion for summary judgment (filing 119) is denied.

Dated this 11th day of December, 2023.

BY THE COURT:

_____
John M. Gerrard
Senior United States District Judge